ANTON HANDAL (Bar No. 113812)
anh@handal-law.com
PAMELA C. CHALK (Bar No. 216411)
pchalk@handal-law.com
GABRIEL HEDRICK (Bar No. 220649)
ghedrick@handal-law.com
HANDAL & ASSOCIATES
750 B Street, Suite 2510
San Diego, California 92101
Tel: 619.544.6400
Fax: 619.696.0323
Attorneys for Plaintiff
e.Digital Corporation

Attorneys for Plaintiff
E.DIGITAL CORPORATION

# UNITED STATES DISTRICT COURT

# NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| E.DIGITAL CORPORATION,<br><br>　　　　Plaintiff,<br><br>v.<br><br>DROPCAM, INC.,<br><br>　　　　Defendant. | Case No. 3:14-cv-04922-JST<br><br>**PLAINTIFF'S REPLY CLAIM CONSTRUCTION BRIEF (PATENT L.R. 4-5(c))**<br><br>Judge: Hon. Jon S. Tigar<br>Ctrm: 9<br>Hearing: August 3, 2015<br>Time: 2:00 p.m. |

# TABLE OF CONTENTS

I. CONSTRUCTION OF DISPUTED CLAIM TERMS ........................................................... 1

    A. "social signature" ............................................................................................... 1

        1. The Specifications Make Clear That The Social Signature May Include Information Other Than Just "Raw Or Processed Data." ............... 1

        2. The Social Signature May Exclude Optical And Acoustic Sensor Data. ................................................................................................................ 2

        3. The Social Signature, By Itself, Need Not Be Indicative Of User Activity. ............................................................................................................ 3

    B. "social hierarchy" ............................................................................................... 4

        1. The Social Hierarchy Is Not Necessarily An Ordered Ranking. ...................... 4

        2. A Social Hierarchy Is Not Necessarily Limited To Social Groups. ................ 5

        3. The Social Hierarchy Is Not Necessarily Defined Within The Social Template .......................................................................................................... 5

    C. "social template" ................................................................................................. 7

    D. "unique social signature" .................................................................................... 9

    E. "sensor value range" ........................................................................................... 9

        1. The Values Of A "Sensor Value Range" Are Not Necessarily Measurements, But A Representation Of Possible Sensor Data Output Values ................................................................................................. 9

        2. Dropcam's Proposed "A Range Between Two Values" Is Unduly Limiting. ........................................................................................................ 10

    F. "optical sensor" ................................................................................................. 11

    G. "information" .................................................................................................... 12

    H. "provide/provides/providing differing levels of information" ........................ 12

    I. "provided/provides/providing an update" ....................................................... 14

    J. "accurate" .......................................................................................................... 14

II. CONCLUSION ................................................................................................................ 15

HANDAL & ASSOCIATES
750 B STREET
SUITE 2510
SAN DIEGO, CA 92101
TEL: 619.544.6400
FAX: 619.696.0323

# TABLE OF AUTHORITIES

**CASES**

*Comark Communs. v. Harris Corp.*, 156 F.3d 1182, 1186 (Fed. Cir. 1998) ............................. 1, 13

*Deere & Co. v. Bush Hog, LLC*, 703 F.3d 1349, 1354 (Fed. Cir. 2012) ................................... 1, 6

*Liebel Flarsheim Co. v. Medrad, Inc.*, 358 F.3d 898, 906 (Fed. Cir. 2004) ............................. 1, 13

*Markman v. Westview Instruments, Inc.*, 52 F.3d 967, 980 (Fed. Cir. 1995) ........................... 1, 13

*Philips v. AWH Corp.*, 415 F.3d 1303, 1314 (Fed. Cir. 2005) ....................................................... 13

*Polycom, Inc. v. Codian Ltd.*, 2007 U.S. Dist. LEXIS 97892, *93-94 (E.D. Tex. 2007) ......... 3, 12

*Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1582 (Fed. Cir. 1996) .............................. 13

HANDAL & ASSOCIATES
750 B STREET
SUITE 2510
SAN DIEGO, CA 92101
TEL: 619.544.6400
FAX: 619.696.0323

*PLAINTIFF'S REPLY CLAIM CONSTRUCTION BRIEF*     Case No. 14-cv-04922-JST

## I. CONSTRUCTION OF DISPUTED CLAIM TERMS

### A. "social signature"

The claims, not the specifications, define the right to exclude. *Markman v. Westview Instruments, Inc.*, 52 F.3d 967, 980 (Fed. Cir. 1995); *Comark Communs. v. Harris Corp.*, 156 F.3d 1182, 1186 (Fed. Cir. 1998). In its attempt to support its narrow proposed construction of "social signature," as with nearly all of its proposed constructions, Dropcam improperly cherry-picks embodiments described in the specification. However, it is inappropriate to import claim limitations from the specification absent a clear intention to limit the scope of the claims. *See Deere & Co. v. Bush Hog, LLC*, 703 F.3d 1349, 1354 (Fed. Cir. 2012); *see also Liebel Flarsheim Co. v. Medrad, Inc.*, 358 F.3d 898, 906 (Fed. Cir. 2004) ("[e]ven when the specification describes only a single embodiment, the claims of the patent will not be read restrictively unless the patentee has demonstrated a clear intention to limit the claim scope using words or expressions of manifest exclusion or restriction")

#### 1. The Specifications Make Clear That The Social Signature May Include Information Other Than Just "Raw Or Processed Data."

Dropcam wrongly argues that a "social signature" must be limited to "received sensor data." (Dropcam Responsive Brief at 5:14-16.) Dropcam's argument reveals a fundamental misunderstanding regarding the claims and claim terms contained in each of the Nunchi patents. For example, in the "device location" embodiment discussed in the specifications, the processor *starts* with the sensor data. (Ex. A ('522 patent) at 1:47-58; *see also id.* at 3:47-60 and *passim*.) However, in the process of constructing the detected social signature, the processor compares the incoming sensor data with "map data." (*Id.* at 1:47-58.) Nothing in the specification or claims limits this "map data" to data obtained directly from a sensor. Thus, "map data" could be stored or otherwise retrievable information from a map application, software or other stored or retrievable data. (*See id.* at 13:40-45 ("the mapping processor can compare the sensed location with a map stored in the mobile device 100 or retrieved from a query to an internet service such as MapQuest or Google maps, and determine the location as being a restaurant, store, office or other like location according to such publicly available information").)

The detected social signature is then created, which includes "***information*** on the map

HANDAL & ASSOCIATES
750 B STREET
SUITE 2510
SAN DIEGO, CA 92101
TEL: 619.544.6400
FAX: 619.696.0323

location of the communication device." (Emphasis added.) (Ex. A ('522 patent) at 1:47-58.) Importantly, the quoted embodiment does not disclose *sensor data* comprising a "map location." (*Id.*) The embodiment makes clear that the "map location" is only derived after a comparison of the sensor data with "map data." (*Id.*) The resulting "map location," *e.g.*, "restaurant," "store," "office," etc. is not sensor data in these embodiments, but is "based on" the sensor data. Thus, in this embodiment, the social signature can be constructed to include not just the raw sensor data, but "information based on" data retrieved from the sensors and/or other retrievable information.

### 2. The Social Signature May Exclude Optical And Acoustic Sensor Data.

Citing the '618 patent, Dropcam mistakenly argues that all claims require that the detected sensor data includes [*sic*] 'a first detected sensor value … from an optical sensor and second sensor value … from an acoustic sensor.'" (Dropcam Responsive Brief at 6:1-4.) First, while claim 22 of the '618 patent, relied upon by Dropcam, does expressly require that the first and second sensor values of the social signature of that claim be derived from the optical and acoustic sensors, respectively, other claims and patents descended from the parent '522 patent, which share the same specification, are not so limiting. For example, as noted in the Opening Brief, U.S. Patent No. 9,002,331, which is a direct continuation of the '522 patent, only mentions optical and audio sensors in one claim – independent claim 21. None of the other claims of that patent require optical or audio sensors, let alone a social signature comprised of data derived from said sensors. (*See* Exhibit G, claims 1-25.) Further, the "map location" embodiment described in the previous section above contains no mention of the presence of acoustic or optical sensor information in the constructed social signature. (Ex. A ('522 patent) at 1:47-58; 13:40-45.)

Finally, Dropcam further concedes that the claims of the Nunchi patents cover systems using sensors other than optical and acoustic sensors and that a social signature can include data obtained from these other sensors. (Dropcam Responsive Brief at 7:5-8.)[1] If the inventor

---

[1] Dropcam contends that its construction does not limit the social signature to acoustic and optical sensor data only, but that its proposed construction only requires the social signature to include "at least" acoustic and optical sensor data. (*Id.*) The plain language of its proposed

HANDAL & ASSOCIATES
750 B STREET
SUITE 2510
SAN DIEGO, CA 92101
TEL: 619.544.6400
FAX: 619.696.0323

intended to require every social signature of the Nunchi patents to include acoustic and optical sensor data, they would have used the language of claim 22 of the '618 patent in every claim, including the referenced '331 patent. He did not.

The fact that particular asserted claims from the patents-in-suit expressly require that a social signature comprise at least data derived from optical and acoustic sensors for that particular claim, does not mean that the Court should redefine the broader meaning of "social signature" contemplated by the inventor. Importing limitations from specific asserted claims into the broader term "social signature" would wrongly exclude those embodiments described in the spec that are not so limited and would wrongly redefine those claims derived from the same spec that are not so limited, such as, without limitation, those contained in the '331 patent. (*See Polycom, Inc. v. Codian Ltd.*, 2007 U.S. Dist. LEXIS 97892, *93-94 (E.D. Tex. 2007) ("many of the limitations in Polycom's construction are already listed as limitations in the surrounding claim language and do not need to be imported into the definition of the term".)

### 3. The Social Signature, By Itself, Need Not Be Indicative Of User Activity.

Dropcam's assertion that a social signature must be "indicative of a user activity" (Dropcam Responsive Brief at 7:24-9:3) wrongly puts the cart before the horse. Indeed, Dropcam states, "The constructed social signature *is then used to determine a type of activity* such as 'driving, napping, in a meeting, showering.'" (Emphasis added.) (*Id.* at 8:24-9:1.) Its own statement therefore suggests that any activity classification occurs *after* the social signature is constructed. e.Digital does not dispute that the social signature *can be used* to determine a type of activity, but this can only be determined after a processor processes the social signature. (*See* Ex. A at Fig. 3 and 18:63-19:3.)

A social signature, by itself, can be comprised of just raw and/or processed data and/or other information based on the sensors of a particular system. (*Id.*) By itself, the social signature need not be indicative of anything other than the data derived from the sensors until, if at all, a processor processes the social signature. (*Id.*) In fact, each of the specification excerpts relied

construction belies this contention.

HANDAL & ASSOCIATES
750 B STREET
SUITE 2510
SAN DIEGO, CA 92101
TEL: 619.544.6400
FAX: 619.696.0323

upon by Dropcam confirms that this classification is done *after* the social signature is constructed. (Dropcam's Responsive Brief at 8:1-4.)

In addition, to the extent there is a subsequent classification based on the social signature, it is not necessarily limited to a "social activity." As shown in the Opening Brief, the classification could indicate "non-use of the input device." (Opening Brief at 8:5-8.) Dropcam argues that these examples cited by e.Digital in its Opening Brief confuse "unprocessed data" with "examples of what the claimed 'social signature' may identify." (Dropcam Responsive Brief at 8:13-24.) Rather, it is Dropcam who is confused. As set forth in the Opening Brief, raw data might consist of a pulse rate, but the classification of whether that rate is high or low would not necessarily be raw data from the heart rate sensor; rather that would be a classification derived after processing the sensor data and, moreover, is not indicative of a "social activity." (Opening Brief at 8:9-14.) Similarly, a social signature derived from "sensors [which] detect … that the mobile device … is outside" might consist of, among other things, GPS data, temperature readings, and/or map location, but the classification that a device is outside is not "raw sensor data" or "unprocessed data" as Dropcam suggests. More importantly, a classification that a device is "outside," is not necessarily indicative of a *user's* social activity.

**B.     "social hierarchy"**

**1.     The Social Hierarchy Is Not Necessarily An Ordered Ranking.**

Dropcam selectively points to a number of embodiments in the specifications it claims demonstrate that a "social hierarchy" must consist of an ordered ranking with levels "ranked from greatest to least amount of provided information." (Dropcam Responsive Brief at 9:13-10:5.) To be clear, a social hierarchy *can be* an ordered ranking, but the specifications and claims of the Nunchi patents make clear that a "social hierarchy" is not limited to an ordered ranking. Further, any ordered ranking need not be limited to "greatest to least amount of provided information," which incidentally, is not even required by Dropcam's own proposed construction. For example, Dropcam fails to address the embodiments cited by e.Digital in its Opening Brief, such as the emergency embodiment whereby different recipients may receive information through different operations, such as "text messages, emails, computer read

HANDAL & ASSOCIATES
750 B STREET
SUITE 2510
SAN DIEGO, CA 92101
TEL: 619.544.6400
FAX: 619.696.0323

-4-

*PLAINTIFF'S REPLY CLAIM CONSTRUCTION BRIEF*     Case No. 14-cv-04922-JST

1  messages sent to a voice line, and … networking service and microblog updates." (Ex. A ('522
2  patent) at 21:4-14 (emphasis added); *see also id.* at 21:19-24, 21:28-33, 21:38-44.) Hierarchy
3  levels would not be distinguished by the amount of information disclosed but by the operation
4  used to convey the information and, thus, Dropcam's proposed construction is too narrow.

Further, Dropcam's argument that an arrangement limited to only one level is not a hierarchy under the plain and ordinary meaning of the term belies the fact that both parties acknowledge the inventor intended to act as his own lexicographer with respect to this term. Dropcam's attempt to try to shoehorn the construction of "social hierarchy" back into the plain and ordinary meaning of the term "hierarchy" is misguided. e.Digital does not dispute that a social network could be one of several hierarchy levels, but neither the claims nor the specification requires that there be additional levels. (*See, e.g.*, Ex. A at 17:21-24 ("it is understood that additional or fewer levels can be provided, depending on the social template").)

### 2. A Social Hierarchy Is Not Necessarily Limited To Social Groups.

Once again, Dropcam isolates single embodiments from the specification to support its limiting construction while ignoring those that are directly contrary to its position. As set forth in the opening brief and above, a social hierarchy could consist of an arrangement of different operations, such as email, text, computerized voice message, social network update, etc. These operations are not "social groups." Similarly, Dropcam completely ignores the "emergency" embodiment, which allows for information to be sent to "emergency services," which one of ordinary skill in the art would not equate with a "social group." Likewise, the claims and specifications of the Nunchi patents do not preclude a social hierarchy comprised of an individual person, thing or operation. An individual is not a "group." Dropcam's attempt to limit social hierarchy levels to "social groups" is plainly wrong and should therefore be rejected.

### 3. The Social Hierarchy Is Not Necessarily Defined Within The Social Template

The claims of the Nunchi patents are relatively broad when it comes to the relationship between the social template and social hierarchy. For example, claim 1 of the '522 patent provides in pertinent part:

"each social template being selectable to provide, for each level of the

HANDAL & ASSOCIATES
750 B STREET
SUITE 2510
SAN DIEGO, CA 92101
TEL: 619.544.6400
FAX: 619.696.0323

predetermined social hierarchy, a corresponding differing amount of information
to each member of the predetermined social hierarchy"

(Ex. A at claim 1.)

With respect to the relationship between the social template and social hierarchy, all this particular claim (and similar claims) requires is that a social hierarchy be associated with a social template so that, when a social template is "selected" by the processor, the processor can make information available to the various members of the social hierarchy *based on* the selected social template. Nothing in this or any other claim of the Nunchi patents requires that the social hierarchy be "defined within each social template" as argued by Dropcam. At minimum, the claims simply require that the social template comprise parameters and/or information against which the detected social signature can be compared and analyzed (*id.*), as encompassed by e.Digital's proposed construction. Dropcam's proposed construction completely fails to address this required component of a social template at all. In fact, while focusing on Table 2 of the specifications, Dropcam completely ignores the data ranges represented in Table 1. (*See* Ex. A at 15:48-57.)

Dropcam points to just one embodiment that suggests that a social hierarchy can be stored somewhere in the social template. However, as set forth above, the claims do not require it and it would be improper to import a single, isolated embodiment as a claim limitation. (*See* Dropcam Responsive Brief at 12:1-2, citing '618 patent at 14:53-54; *see also Deere & Co. v. Bush Hog, LLC*, 703 F.3d 1349, 1354 (Fed. Cir. 2012).) Moreover, the specifications repeatedly make clear that a social hierarchy need only be associated with or correspond to a social template. (*See* Ex. A ('522 patent) at Abstract (emphasis added); *see also id.* at 1:29-36; 2:59-60 ("According to an aspect of the invention, at least one of the social templates **corresponds** to an emergency update") (emphasis added); 3:28-33; 4:58-60; 5:34-42; 7:44-49; claims 1, 8, 17; Ex. B ('514 patent) at claims 1, 5, 10, 14, 21, 26, 34, 36; Ex. C ('523 patent) at claims 1 and 19; Ex. D ('524 patent) at claim 1; Ex. E ('618 patent) at claims 1, 6, 15, 22; Ex. F ('619 patent) at claims 1, 4, 19, 29.)

The remaining embodiments upon which Dropcam attempts to rely do not support a conclusion that a social hierarchy is defined within the social template. At best, they suggest a

HANDAL & ASSOCIATES
750 B STREET
SUITE 2510
SAN DIEGO, CA 92101
TEL: 619.544.6400
FAX: 619.696.0323

relationship between a social template and a social hierarchy, but to they do not necessarily lead to the conclusion that the social hierarchy is defined within the social template. For example, nowhere in the specifications does the inventor state that the information represented in Table 2 is contained, stored or otherwise defined *within* the social template. (Ex. A ('522 patent) at 15:43-16:64.) Table 2 is simply demonstrative and indicates how a social template can be used to provide different information to different members of a social hierarchy; it is not a technical drawing. It does not require that the social hierarchy be defined in the social template as stored in the system's memory. e.Digital does not dispute that the social template may contain rules for what information may be provided to members of a social hierarchy as Table 2 suggests, but the hierarchy is not necessarily "defined" within the social template.

Dropcam's argument that "it would not be possible for a 'social template' to provide 'information to each member of the predetermined social hierarchy" if the social hierarchy were not "defined within" each social template is simply unsupported and erroneous. (*See* Dropcam's Responsive Brief at 13:15-20.) Once a processor evaluates the detected social signature in light of the various social templates to arrive at a classification, the processor can associate that classification with a given social hierarchy even if said hierarchy is not stored in the social template in the system's memory. This can be done, by way of example and not limitation, using a simple index system or any other means of linking data.

C. **"social template"**

The fact that a social template does not "store" a social hierarchy is discussed at length and supported in the previous section. e.Digital therefore incorporates those arguments as though set forth fully herein. Similarly, social templates do not "store" a social signature, particularly as that term is defined by Dropcam. The specifications do refer to a "social signature of the social template," but this is not the "detected social signature" Dropcam attempts to define in its proposed construction of "social signature." Rather, the "social signature of the social template" more accurately refers to the sensor value ranges that make up the "unique social signature" described in the claims and throughout the specifications. (*See, e.g.*, Ex. A at claims 1 ("each social template corresponding to a unique social signature comprising a first

HANDAL & ASSOCIATES
750 B STREET
SUITE 2510
SAN DIEGO, CA 92101
TEL: 619.544.6400
FAX: 619.696.0323

sensor value range and a second sensor value range …"), 8, and 17, *etc*.) The purpose of these sensor value ranges is to provide a basis for selecting at least one social template to then be used by a processor to analyze the detected social signature. (*See* Ex. A at claim 1 ("processor … determines which of the social signatures of the stored social templates has a greatest correspondence with the created social signature through comparison of the first and second detected sensor values and the first and second sensor value ranges of each stored social template"); *see also, e.g., id.* at Fig. 3, 18:63-19:3 ("In operation 315 [of Fig. 3], the formatted data [i.e., the detected social signature] is compared to the social templates").)

Neither Dropcam's construction of "social template" nor its construction of "social signature" encompasses the sensor value ranges discussed throughout the claims and specifications. Rather, Dropcam's proposed construction of "social signature" as a "combination of optical sensor data and acoustic sensor data indicative of a type of activity" would exclude the sensor value ranges clearly disclosed by the patents. In fact, Dropcam relies heavily on Tables 1 and 2 to support its proposed "social template" and "social hierarchy" constructions, but conveniently ignores the value ranges contained in Table 1. These ranges are not "data," to which Dropcam's proposed "social signature" construction is limited, but are instead representations of sensor value possibilities, against which, the actual retrieved data can be analyzed. Dropcam's proposal to incorporate its proposed construction of "social signature" into the construction of "social template" cannot be correct.

Dropcam mistakenly contends that the patentee somehow "disclaimed any social template that does not have each of a social signature and a social hierarchy." (Dropcam Responsive Brief at 13:4-12.) Dropcam asserts that "the applicant explained that the prior art 'contact record' was not a 'social template' on the basis that it had no social hierarchy where the 'privacy settings' were not stored in the 'contact record' like the social hierarchy is stored in the 'social template.'" (*Id.* at 13:8-11, citing Dropcam's Ex. B ('618 Prosecution History, March 16, 2012 Applicant Arguments/Remarks) at p. 5.) However, the patentee said nothing of the sort! There is absolutely no statement by the patentee that that a social hierarchy is "stored" in the social template. In fact, when referring to the invention of the '618 patent, the patentee only

-8-
*PLAINTIFF'S REPLY CLAIM CONSTRUCTION BRIEF*     Case No. 14-cv-04922-JST

HANDAL & ASSOCIATES
750 B STREET
SUITE 2510
SAN DIEGO, CA 92101
TEL: 619.544.6400
FAX: 619.696.0323

1 refers to "assigning" a constructed social signature or social hierarchy to a social template. (*Id.*)
"Assigning," is entirely consistent with e.Digital's position and is not the equivalent of "storing."

Finally, Dropcam's insistence that a "social template" is a "data structure" does nothing to clarify the meaning of the term. e.Digital does not dispute that the "social template" is a data structure. However, inclusion of the term in the construction of "social template" is more likely to confuse rather than enlighten a lay jury responsible for determining infringement. First, the term is not used anywhere in the specifications. Second, "data structures" are not a commonly understood concept and the term would likely require its own separate construction, which Dropcam has not defined or asked the Court to define at any point to date.

### D. "unique social signature"

Dropcam argues that e.Digital's proposed construction fails to specify what the unique social signature is associated with. (Dropcam Responsive Brief at 14:8-12.) However, the context is provided by the claim itself as explained in the Opening Brief. (Opening Brief at 13:23-26.) Plaintiff's proposed construction, read in the context of the full claim limitation, makes clear that a "unique social signature" is one that is associated specifically with a particular social template at a given time. Unlike, Dropcam's proposed construction, e.Digital's construction makes room for embodiments discussed in the specifications, including the training embodiments which contemplate the use of another template upon unsuccessful classification and the adaption of templates to successfully associate a unique social signature with the social templates. Its conclusory assertions to the contrary, Dropcam's proposed construction would wrongly imply that a social signature can only ever be associated with one social template.

### E. "sensor value range"
#### 1. The Values Of A "Sensor Value Range" Are Not Necessarily Measurements, But A Representation Of Possible Sensor Data Output Values

"Sensor value range(s)" are those parameters associated with "social templates." As discussed above with respect to "social templates," a sensor value range is not sensor data, but rather a representation of possible sensor data output values. (Ex. A ('522 patent) at 15:48-58.) These values are not necessarily data directly derived from sensors as Dropcam appears to

HANDAL & ASSOCIATES
750 B STREET
SUITE 2510
SAN DIEGO, CA 92101
TEL: 619.544.6400
FAX: 619.696.0323

-9-
*PLAINTIFF'S REPLY CLAIM CONSTRUCTION BRIEF*                Case No. 14-cv-04922-JST

suggest.  Sensor value ranges *can* be, either in whole or in part, derived from the system's sensors as disclosed in the "training" embodiments described throughout the specifications, but nothing in the specifications or the claims precludes these values from being pre-defined, whether by the system's OEM, the user, or any other person, device or function that can define a sensor value range.  (*See*, *e.g.*, Ex. A ('522 patent) at 17:17-21, 19:55-56 ("user might create a new social template"), 19:59-65 ("social templates could be…refined through the collective experience of any number of other user experiences"), claim 1 (requiring only that the social template consist of sensor value ranges, but not defining how the ranges are constructed), *et al.*)  Thus, even to the extent the sensors of a Nunchi-based system take "measurements," it would not be accurate to say that the "sensor value range" is limited to a "range of measurements."

Dropcam concedes that a detected social signature, which is the data or other information being compared to the sensor value ranges, can consist of "processed data."  Going back to the "map location" embodiment discussed previously, "the processor compares the location with map data to determine a map location of the communication device, and creates the detected social signature to include information on the map location of the communication device, the movement being experienced by the communication device, and the environment of the communication device." (Ex. A ('522 patent) at 1:47-58.)

The determined map location could be "restaurant, store, office," etc. (*See id.* at 13:40-45.)  This "value," which was determined from processing raw sensor data with other map data, is not itself a "measurement," even though it may have been derived in part from sensor measurements.  It stands to reason, then, that any sensor value range related to this portion of the social signature would not be a "range of measurements" as proposed by Dropcam.  It could be a "range of places," *e.g.*, "Starbucks, Peets, Coffee Bean" or "Vons, Albertsons, Sprouts, Ralphs," rather than simply "numerical values" as argued by Dropcam.

2. **Dropcam's Proposed "A Range Between Two Values" Is Unduly Limiting.**

As set forth in the Opening Brief, the plain and ordinary meaning of the term range is "a variation within limits." (Ex. H at 596.)  A plain understanding of a "limit" includes not just an interval, which is what Dropcam proposes, but also a ceiling and a floor.  Nothing in the claims

-10-
*PLAINTIFF'S REPLY CLAIM CONSTRUCTION BRIEF* Case No. 14-cv-04922-JST

themselves confines a range to only a "range…between two values." Dropcam once again seeks to usurp the plain and ordinary meaning of a range by unduly importing limitations from an embodiment in the specification.

   F.   "optical sensor"

Dropcam argues that "neither the claims nor the specification contemplate [an optical sensor] detecting 'one or more' amounts" of light." (Dropcam Responsive Brief at 3-5.) This is not correct. The specifications repeatedly disclose embodiments in which sensors take measurements at intervals or continuously, from which a person of ordinary skill in the art would infer the likelihood of multiple sensor measurements. (*See* Ex. A ('522 patent) at 11:51-53 ("The optical sensor 130 may generate simple light level measurement data continuously, or at a sampling rate that may be fixed or variable"); *see also* 11:23-27 ("The inertial sensor 120 may generate acceleration measurement data continuously, or at a sampling rate that may be fixed or variable"); 11:41-43; 12:62-13:7 (noting the use of location sensor to sample multiple sensor measurements to determine acceleration rates "using the differences in the location measurements").) The specifications further disclose "the optical sensor 130 can be a camera (still or video) as used in mobile phones." (*Id.* at 11:55-56.) Video inherently requires continuous light level and light characteristic (*e.g.*, color) measurements. It is therefore more than obvious from the specification that the "optical sensor" of the Nunchi patents is not limited to "a single light level measurement."

Dropcam further argues that its proposed construction allows for optical sensors that do more than just collect data about the "amount of light" in an environment. They assert that their construction reflects the proposition that "an 'optical sensor' must *at least* collect data about the amount of light in the environment." However, the words "at least" appear nowhere in Dropcam's proposed construction and, thus, Dropcam's own argument appears to be a shift away from its own initial construction. e.Digital's proposed construction on the other hand makes clear that an "optical sensor" can be capable of detecting other qualities of light as disclosed in the specifications of the Nunchi patents. Its construction should therefore be adopted.

///

HANDAL & ASSOCIATES
750 B STREET
SUITE 2510
SAN DIEGO, CA 92101
TEL: 619.544.6400
FAX: 619.696.0323

### G. "information"

Dropcam asserts that the "information" provided to the hierarchy "must result from the social template comparison." (Dropcam Responsive Brief at 19:17-20:5.) However, the social template comparison is already a component of the claims and therefore need not be incorporated into the Court's construction. *See Polycom, Inc.*, *supra* at *93-94. Moreover, the claims do not speak in terms of comparing just "sensor data with social templates." The claims disclose a number of steps that ultimately "result" in, *e.g.*, providing "to at least one member of the predetermined social hierarchy only as much information as allowed based on the retrieved social template." (*See*, *e.g.*, Ex. A ('522 patent) at claim 1, *et al.*) Dropcam's attempt to paraphrase the limitations of the over-100 varied claims of the Nunchi patents into a single proposed construction of the term "information" is incomplete and, therefore, inaccurate.

Dropcam further argues that "each social hierarchy level must receive information about the **same event**." (Emphasis added.) (Dropcam Responsive Brief at 20:6-21:5.) Setting aside for a moment whether Dropcam is correct – which it is not – this is not even Dropcam's proposed construction. Rather, Dropcam's proposed construction is that information must relate to a "single event," not the "same event."

In any event, Dropcam's argument is flawed for a number of reasons. First, it presumes that "each social hierarchy level must receive information." As noted above, claim 1 of the '522 patent (as with other claims), only requires that "**at least one member** of the predetermined hierarchy [be provided] only as much information as allowed." (Emphasis added.) (Ex. A at claim 1.) Second, the claims do not say anything about a "single event," "same event" or any "event." As pointed out in e.Digital's Opening Brief, the information provided, if any, can relate to availability for a phone call, which is not an "event," or to multiple events detected by continuous or multiple-sampled sensor measurements.

### H. "provide/provides/providing differing levels of information"

As demonstrated in the Opening Brief, the plain and ordinary meaning of "provide" is not limited to "send," which construction could potentially exclude the "social network" and "microblog" embodiments discussed in the patents that disclose "updating," e.g., a personal

HANDAL & ASSOCIATES
750 B STREET
SUITE 2510
SAN DIEGO, CA 92101
TEL: 619.544.6400
FAX: 619.696.0323

Facebook or Linked-In page, which is not strictly "sending" information, but could also encompass a simple modification of an already existing post. (*See* Opening Brief at 19:13-18.)

Dropcam's assertion that claim construction is limited to those *embodiments* actually disclosed by the patentee is wrong. The claims, not the specifications, define the right to exclude. *Markman*, *supra* at 980; *Comark Communs.*, *supra* at 1186. It is hornbook law that claim terms are generally given their ordinary and customary meaning. *Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1582 (Fed. Cir. 1996). As the Supreme Court in *Philips* acknowledged, "[i]n some cases, the ordinary meaning of claim language as understood by a person of skill in the art may be readily apparent even to lay judges, and claim construction in such cases involves little more than the application of the widely accepted meaning of commonly understood words." *Philips v. AWH Corp.*, 415 F.3d 1303, 1314 (Fed. Cir. 2005). This is clearly one of those instances. Dropcam cannot be permitted to cherry-pick embodiments described in the specification to support a construction that does not comport with the plain and ordinary meaning of claim terms. *See Deere & Co. v. Bush Hog, LLC*, *supra* at 1354; *see also Liebel Flarsheim Co.*, *supra* at 906.

Finally, "differing levels of information" is not limited to "different amounts of disclosure." Dropcam misrepresents e.Digital's statements in the Opening Brief. e.Digital did not say "the information reported to the levels of the social hierarchy differs by the amount of disclosure" in every embodiment. Rather, e.Digital stated:

> In each of the embodiments described in the patents and in the claims, different ***types of information*** are automatically made available to people or websites based on what information the user wants to make available. The levels of the hierarchy are not necessarily ordered or ranked. What sets the hierarchy levels apart, assuming there is more than one, relates more to what ***and/or how*** information is provided to the various hierarchy levels and is not necessarily related to importance of the members of each hierarchy level – ***each level is simply "different."***

(Emphasis added.) (Opening Brief at 12:6-12.)

Dropcam further ignores the "emergency" embodiment discussed in that same section which makes clear that the hierarchy can be arranged such that different hierarchy levels are provided information via different operations, such as text, email, voice message, social network

-13-
*PLAINTIFF'S REPLY CLAIM CONSTRUCTION BRIEF*   Case No. 14-cv-04922-JST

1  update, etc. (Opening Brief at 11:11-21; Ex. A at 21:4-14.) This embodiment makes no mention of "different amounts of information." (*Id.* at 21:4-44.)

Once again, Dropcam is improperly singling out select embodiments from the specifications in an effort to limit the scope of the claims. Dropcam's proposed construction must therefore be rejected.

## I. "provided/provides/providing an update"

For the reasons set forth above and in the Opening Brief, "provided/provides/providing" is not limited to "sending" and should be accorded its plain and ordinary meaning. Dropcam further wrongly asserts that an "update" must relate to a "*user's* status." Again, Dropcam self-servingly identifies one embodiment in the specification and attempts to limit the entirety of the claims to that embodiment.

However, social networks and microblogs are commonly used to share updates that are not necessarily directly related to that status of the user, such as, *e.g.*, photographs, music, and links to news articles. (Ex. J at 459.) In its Opening Brief, referring to the "emergency" embodiments discussed in the specifications, e.Digital pointed out several possible emergency examples that could result in social network/microblog updates that do not necessarily relate to the *user's* status. (Opening Brief at 20:18-28.) Dropcam fails to provide any meaningful response to these examples other than to say they are not disclosed in the specification, but the specification clearly discloses an "emergency" embodiment along with a number of other embodiments, within which these examples would fall. The fact that a patentee does not disclose every possible embodiment or permutation of an embodiment cannot possibly mean that a patent claim does not extend to those undisclosed embodiments, particularly where the claims are drafted more broadly.

## J. "accurate"

A proper reading of the "training" claims and specifications of the Nunchi patents demonstrates that the term "accurate" clearly does <u>not</u> mean "free from mistakes or errors." Rather, as shown in the Opening Brief, when the patents use the term "accurate," the question being asked is whether the template that corresponds best with the detected social signature is the

HANDAL & ASSOCIATES
750 B STREET
SUITE 2510
SAN DIEGO, CA 92101
TEL: 619.544.6400
FAX: 619.696.0323

template the user wants to use to process the detected social signature. This is not a "circular definition" as argued by Dropcam.

Dropcam appears to equate the term "error" as used in the Nunchi patents with "mistake." It argues that "the presence of an error within the social signature merely prompts an analysis of the accuracy of the social template." (Dropcam Responsive Brief at 25:8-11.) First, the training claims and embodiments do not speak in terms of errors *within the social signature*. An "error" merely refers to a social signature value outside the range assigned to the social template. (*See, e.g.*, Ex. E at claim 15; Ex. A at 17:15-43; 18:63-19:58.) This is not a mistake and Dropcam's proposed construction is therefore unduly narrow.

In the context of the "baby sleeping" embodiment, the specification states, "where the social signature indicates that the baby is now awake and crying, the social template would be changed to allow information on the new status of the baby, but likely maintain a do-not-disturb social template." (Ex. A at 17:57-61.) This, along with the other embodiments cited in the Opening Brief, do not support a conclusion that a social template necessarily contains any sort of error or mistake. At best, they merely suggest that the user wants to change how the social signature is processed. e.Digital's proposed construction embodies this concept and should be adopted by the Court.

Dropcam further argues, "At no point do the claims or the specification state that the 'determined social template,' whether 'accurate' or 'not accurate,' must prevent the social template from being processed." (Dropcam Responsive Brief at 25:20-27.) However, this is not e.Digital's proposed construction. "Capable of desired processing" does not mean that a social template cannot be processed; as the training embodiments make clear, it simply means that the template is not be processed in the manner desired by the user.

II. **CONCLUSION**

Based on the foregoing, e.Digital respectfully requests that Dropcam's proposed constructions be rejected and that the Court adopt e.Digital's proposed constructions as set forth above.

///

*PLAINTIFF'S REPLY CLAIM CONSTRUCTION BRIEF*     Case No. 14-cv-04922-JST

HANDAL & ASSOCIATES
750 B STREET
SUITE 2510
SAN DIEGO, CA 92101
TEL: 619.544.6400
FAX: 619.696.0323

| | | |
|---|---|---|
| | | Respectfully submitted. |
| | | **HANDAL & ASSOCIATES** |
| Dated: July 1, 2015 | By: | /s/ Gabriel G. Hedrick |
| | | Anton N. Handal |
| | | Pamela C. Chalk |
| | | Gabriel G. Hedrick |
| | | Attorneys for Plaintiff |
| | | e.Digital Corporation |

HANDAL & ASSOCIATES
750 B STREET
SUITE 2510
SAN DIEGO, CA 92101
TEL: 619.544.6400
FAX: 619.696.0323

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that a true and correct copy of the foregoing document has been served on this date to all current and/or opposing counsel of record, if any to date, who are deemed to have consented to electronic service via the Court's CM/ECF system. Any other counsel of record will be served by electronic mail, facsimile and/or overnight delivery.

I declare under penalty of perjury of the laws of the United States that the foregoing is true and correct. Executed this 1st day of July, 2015 at San Diego, California.

/s/ Gabriel G. Hedrick

Gabriel G. Hedrick

*HANDAL & ASSOCIATES*
750 B STREET
SUITE 2510
SAN DIEGO, CA 92101
TEL: 619.544.6400
FAX: 619.696.0323

-17-

*PLAINTIFF'S REPLY CLAIM CONSTRUCTION BRIEF*     Case No. 14-cv-04922-JST